IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JOHN DANIEL FRANCES,
      Petitioner,

vs.                              Case No.:  3:09cv411/MCR/EMT

KENNETH S. TUCKER,
      Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

      This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed under 28 U.S.C. § 2254 and supporting memorandum (doc. 44).  Respondent filed an answer and relevant portions of the state court record (doc. 55).  Petitioner filed a reply (doc. 64).  Also before the court is Petitioner's motion to expand the record (doc. 58) and Respondent's response in opposition (doc. 63).

      The matter is referred to the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636 and N. D. Fla. Loc. R. 72.2(b).  After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a).  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

      The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 55).[1]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, with two counts of burglary of an unoccupied dwelling causing damage in excess of

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 55).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

$1,000.00 (Counts 1 and 2) and two counts of criminal mischief causing property damage of $1,000.00 or more (Counts 3 and 4) (Ex. B at 3–4).  Following a jury trial on November 13–15, 2007, during which Petitioner represented himself, he was found guilty as charged (Exs. C, D, E, F).  Petitioner was represented by counsel at sentencing (*see* Ex. B at 280).  Petitioner was adjudicated guilty and sentenced to concurrent terms of 91.8 months of imprisonment followed by five (5) years of probation on Counts 1 and 2, with pre-sentence credit of seventeen (17) days (*id.* at 280–330, 335–344A).  As to Counts 3 and 4, he was sentenced to concurrent terms of five (5) years of probation, to run consecutively to his prison term on Count 1 and concurrently with the probationary term on Count 1 (*id.*).  Petitioner appealed the judgment and sentence to the Florida First District Court of Appeal ("First DCA"), Case No. 1D08-668 (Ex. B at 345; Exs. G, H, I).  On June 1, 2009, the First DCA affirmed per curiam without written opinion (Ex. J).  Frances v. State, 9 So. 3d 617 (Fla. 1st DCA 2009) (Table).  The mandate issued June 17, 2009 (Ex. K).  On June 19, 2009, Petitioner filed a motion for rehearing (Ex. L).  The appellate court denied the motion (Ex. M).

On September 8, 2009, Petitioner filed a habeas petition alleging ineffective assistance of appellate counsel in the First DCA, Case No. 1D09-4575 (Ex. N).  The First DCA denied the petition on the merits on December 2, 2009 (Ex. Q).  Frances v. State, 27 So. 3d 34 (Fla. 1st DCA 2009) (unpublished).  Petitioner filed a motion for rehearing (Ex. R), which was denied on February 4, 2010.  *Id.*

On July 6, 2010, Petitioner filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. U at 1–45).  On July 29, 2010, the state circuit court issued an order striking the motion, because it contained legally insufficient claims, without prejudice to Petitioner's filing an amended motion within thirty (30) days (*id.* at 58–59).  Petitioner filed a timely amended motion (*id.* at 61–126).  The state circuit court summarily denied the motion on October 18, 2010 (Ex. V at 276–84).  Petitioner appealed the decision to the First DCA, Case No. 1D10-5979 (Ex. W).  The First DCA affirmed the decision per curiam without written opinion on March 9, 2011, with the mandate issuing May 11, 2011 (Ex. Y).  Frances v. State, 66 So. 3d 942 (Fla. 1st DCA 2011) (Table).

Petitioner filed the instant federal habeas action on September 1, 2009 (doc. 1).  Respondent concedes the habeas petition is timely (doc. 55 at 4).

II.     STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA).  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
>> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in <u>Williams v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[2]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established

---

[2] Unless otherwise noted, references to <u>Williams</u> are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06).  If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.  Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it.  Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).  An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001).  "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable.'"  Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87 (Jan. 19, 2011)).  The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it.  See Gill, supra at 1291 (citing Harrington, 131 S. Ct. at 786).  Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. See Harrington, 131 S. Ct. at 786; see also Gill, supra, at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the

petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding."  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see e.g. Miller-El, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); Jones v. Walker, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").  The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. See Gill, 2010 WL 609844, at *18.  A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. Id.

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims.  See Panetti v. Quarterman, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); Jones, 469 F.3d 1216 (same).  The writ will not issue unless the petitioner shows

that he is in custody "in violation of the Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).

III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[3] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights."  Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  Duncan, 513 U.S. at 365–66; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); Picard, 404 U.S. at 277–78.

The Supreme Court has provided lower court with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In Picard v. Connor, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief.  404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," id., 404 U.S. at 278, the Court rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

_____

[3]Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
            (A)  the applicant has exhausted the remedies available in the courts of the State; or
            (B) (i)  there is an absence of available State corrective process; or
                    (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982). In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. Id., 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364. The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[4] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66. More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert

---

[4] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal. 513 U.S. at 366.

it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Id., 541 U.S. at 32. This language, while not part of the Court's holding, provides helpful instruction. With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[5]

The Eleventh Circuit, prior to Duncan, had broadly interpreted the "fair presentation" requirement. After Duncan, however, the Eleventh Circuit has taken a more narrow approach. For example, in Zeigler v. Crosby, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution. 345 F.3d 1300, 1307 (11th Cir. 2003). The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial. . .

---

[5] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. Id.

.,," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution.  *Id.* at 1308 n.5.  The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases.  The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us."  *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review.  *See* O'Sullivan, 526 U.S. at 839–40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default.  *See* Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991).  In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine.  Bailey, 172 F.3d at 1303.  In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question.  *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989).  The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question.  Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002).  The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," Judd v. Haley, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly

unfair manner.  Ford v. Georgia, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); Upshaw v. Singletary, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision.  Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001).  First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[6]  Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law.  Third, the state procedural rule must be adequate. Id.  The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion.  Id.

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause and prejudice or a fundamental miscarriage of justice. Tower, 7 F.3d at 210; Parker, 876 F.2d 1470.  "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim."  McCleskey v. Zant, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting Murray v. Carrier, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)).  Lack of counsel or ignorance of available procedures is not enough to establish cause.  Tower, 7 F.3d at 210.  To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Schlup v. Delo, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995).  "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him."  Schlup, 513 U.S. at 327.  Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare.  To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

---

[6] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits.  Marek v. Singletary, 62 F.3d 1295, 1302 (11th Cir. 1995); Alderman v. Zant, 22 F.3d 1541 (11th Cir. 1994).

*Id.*

Within this framework, the court will review Petitioner's claims.

IV.   PETITIONER'S CLAIMS[7]

A.   <u>Ground One:  "The lower court's exclusion of defense exhibits was an abuse of discretion which prevented the Petitioner from presenting evidence in support of his alibi defense."</u>

<u>Ground Three:  "The trial court's exclusion of evidence regarding ownership of the property was an abuse of discretion which denied the Petitioner the opportunity to present his defense."</u>

In Ground One, Petitioner argues the trial court prevented him from presenting an alibi defense by excluding two "account logs" and two checkbook registers (doc. 44 at 4, 6, 14–17).[8] Petitioner states during his own testimony at trial, he sought to admit this evidence, which showed a record of payments he had received on December 6, 2006 (*id.*).  He states the evidence was relevant to his alibi defense, because it established he was elsewhere collecting payments from clients during the time the State alleged he was burglarizing units 310 and 319 at Bayou Breeze condominiums (*id.*).  He states the trial court ruled the evidence was inadmissible because it was hearsay and did not tend to prove or disprove any material issue relating to Petitioner's alibi (*id.*).

In Ground Three, Petitioner argues the trial court prevented him from presenting his second defense, that is, that the condominium units were not owned by or in the possession of another at the time they were burglarized and damaged; rather, he had title ownership and possessory rights to the units (doc. 44 at 4, 6, 22–27).  He argues the trial court prevented him from presenting this defense by granting the State's motion in limine as to evidence regarding the validity of the sheriff's sale of the condominium units at issue (*id.* at 22–27).

Petitioner contends the trial court's rulings deprived him of his constitutional right to present a defense (doc. 1 at 15–16 (citing <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973))).  Petitioner states he exhausted both claims by raising them on direct appeal of his conviction (*id.* at 6).

---

[7] The court consolidated and reordered Petitioner's claims for organizational purposes.

[8] The page references used in this Report reflect the page numbers as enumerated in the court's electronic docketing system rather than those the parties may have assigned.

Respondent contends Petitioner failed to exhaust either claim, because he failed to present the federal nature of either claim to the trial court or on direct appeal (doc. 55 at 6–8, 16–20). Respondent argues Petitioner presented the state courts with claims of state law error regarding the exclusion of the account logs and checkbook registers and evidence regarding the validity of the sheriff's sale, but Petitioner did not argue any federal basis for either claim (*id.*). Therefore, the claims are unexhausted and procedurally barred (*id.*). Respondent additionally contends, notwithstanding the procedural bar, any error in excluding the account logs and checkbook registers did not have a substantial and injurious effect or influence in determining the jury's verdict, because Petitioner testified at length during trial about his activities on the day in question (*id.* at 8–9). Additionally, the issue of the validity of the sheriff's sale presents purely a matter of state law, which is not reviewable on federal habeas (*id.* at 20–21).

In Petitioner's appellate brief on direct appeal, his first claim of error asserted the trial court's exclusion of the account logs and checkbook registers violated his constitutional and fundamental right to present a defense (Ex. G at 29–32). His third claim of error asserted the trial court's exclusion of evidence regarding ownership of the condominium units denied him the opportunity to present his defense (*id.* at 35–37). He cited Chambers v. Mississippi, 410 U.S. 284, 302 (1973) in support of both claims (*id.* at 29–30, 35, 37). The undersigned concludes Petitioner's citation to a federal source of law was sufficient to alert the state court to the federal nature of his claims. *See* Baldwin, 541 U.S. at 32. Therefore, Petitioner satisfied the exhaustion requirement as to Grounds One and Three.

1.      Clearly Established Federal Law

The constitutional right to due process guarantees a criminal defendant a fair and meaningful opportunity to present a complete defense. *See* Taylor v. Illinois, 484 U.S. 400, 408–08, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988) (Sixth Amendment guarantees a criminal defendant the right to compel the attendance of favorable witnesses at trial and to present their testimony to the jury in his own defense); Crane v. Kentucky, 476 U.S. 683, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'") ; Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair

opportunity to defend against the State's accusations."); *id.* ("The right to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process."); Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923, 18 L. Ed. 2d 1019 (1967) ("The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense. . . . This right is a fundamental element of due process of law.").

However, the Supreme Court has additionally made clear that the right to present a "complete" defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions. *See* Chambers, 410 U.S. at 295 (the right to present a defense is not unlimited, and must bow to "other legitimate interests in the criminal trial process"); Holmes v. South Carolina, 547 U.S. 319, 326, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) ("[W]hile the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury."); Taylor, 484 U.S. at 410 (a defendant "does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence."); Crane, 476 U.S. at 689–90 (permitting exclusion of evidence that "poses an undue risk of 'harassment, prejudice, [or] confusion of the issues'" (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986))); *see also* Montana v. Egelhoff, 518 U.S. 37, 53, 116 S. Ct. 2013, 135 L. Ed. 2d (1996). Rather, a defendant "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Chambers, 410 U.S. at 302.

Petitioner relies upon Chambers v. Mississippi as the clearly established federal law governing his claims (doc. 44 at 16). Therefore, the court will examine the specific holding of that case. In Chambers, a defendant who was charged with murder sought to prove that another individual, McDonald, had confessed to the murder. 410 U.S. at 287–91. The trial court, however, excluded both McDonald's written confession and a series of witnesses to whom McDonald had verbally confessed, based upon a Mississippi evidence law which did not recognize a hearsay

exception for declarations against penal interest.  *Id.* at 291–94.  The Supreme Court concluded that "the exclusion of this critical evidence [the testimony of the witnesses to whom McDonald confessed], coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process."  *Id.* at 302. Because the trial court had prevented Chambers from presenting evidence that was <u>both reliable and critical to his defense</u>, the Supreme Court determined that Chambers was entitled to a new trial.  *Id.* at 302–03 (emphasis added).  The Supreme Court then stressed the narrowness of its holding, stating:

> In reaching this judgment, we establish no new principles of constitutional law.  Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and their procedures.  Rather, we hold quite simply and under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

*Id.* at 302–03.

Indeed, the Supreme Court subsequently characterized <u>Chambers</u> as "an exercise in highly case-specific error correction."  <u>Egelhoff</u>, 518 U.S. at 53.  The Court stated:

> [T]he holding of <u>Chambers</u>—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence" favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

*Id.*

In <u>Callahan v. Campbell</u>, 427 F.3d 897 (2005), the Eleventh Circuit rejected a federal habeas petitioner's argument that <u>Chambers</u> is the clearly established federal law governing a challenge to the trial court's exclusion of testimony from a particular defense witness.  Callahan cited the following cases as the clearly established federal law governing his claim:  <u>Crane</u>, 476 U.S. 683 (1986), <u>Chambers</u>, <u>Taylor</u>, 484 U.S. 400 (1988), and <u>Washington</u>, 388 U.S. 14 (1967).  <u>Callahan</u>, 427 F.3d at 929–30.  The Eleventh Circuit stated that "on a very high level of generality" those cases address a defendant's right to present evidence in his defense;

> However, just because a Supreme Court opinion refers to a defendant's right to [present evidence], does not necessarily mean that case is "on point" for all future

cases involving asserted [due process] rights . . . . Callahan must point to a Supreme
Court case addressing a situation similar to his, and he has not done so.

*Id.* at 903.

2.    Federal Review of State Court Decision

a.    State court record

The State charged Petitioner as follows:

COUNT 1:  . . . **JOHN DANIEL FRANCES, between December 6, 2006 and
December 7, 2006**, . . . did unlawfully and without a licensed or invited entry, enter
an occupied or unoccupied dwelling or structure, to-wit:  **condominium** with the
intent to commit an offense therein; . . . said offense or offenses intended to be
committed therein, being **theft and/or criminal mischief and/or other offenses**,
said occupied or unoccupied dwelling or structure being located at **300 Bayou Blvd.,
Unit 310**, the property of **Dayne Family Trust** as owner or custodian thereof, and
in the course of committing said offense, the said **JOHN DANIEL FRANCES**
entered or remaining therein and caused damage to the said dwelling or structure or
to the property within the dwelling or structure in excess of $1,000, in violation of
Sections 310.02(1) and (2)(c)2., Florida Statutes. . . .

COUNT 2:  . . . **JOHN DANIEL FRANCES, between December 6, 2006 and
December 7, 2006**, . . . did unlawfully and without a licensed or invited entry, enter
an occupied or unoccupied dwelling or structure, to-wit:  **condominium** with the
intent to commit an offense therein; . . . said offense or offenses intended to be
committed therein, being **theft and/or criminal mischief and/or other offenses**,
said occupied or unoccupied dwelling or structure being located at **300 Bayou Blvd.,
Unit 319**, the property of **Dayne Family Trust** as owner or custodian thereof, and
in the course of committing said offense, the said **JOHN DANIEL FRANCES**
entered or remaining therein and caused damage to the said dwelling or structure or
to the property within the dwelling or structure in excess of $1,000, in violation of
Sections 310.02(1) and (2)(c)2., Florida Statutes. . . .

COUNT 3:  . . . **JOHN DANIEL FRANCES, on or about December 6, 2006**, . .
. did willfully and maliciously injure or damage by any means any real or personal
property belonging to another, to-wit:  **300 Bayou Blvd Unit 310**, the property of
**Dayne Family Trust**, by **putting holes in appliances/cabinets/doors and/or
tearing the carpet and/or other damage**, the damage to such property being $1,000
or greater, in violation of Section 806.13(1)(a) and (b)3., Florida Statutes. . . .

COUNT 4:  . . . **JOHN DANIEL FRANCES, on or about December 6, 2006**, . .
. did willfully and maliciously injure or damage by any means any real or personal
property belonging to another, to-wit:  **300 Bayou Blvd Unit 319**, the property of

> **Dayne Family Trust**, by **putting holes in appliances/cabinets/doors and/or tearing the carpet and/or other damage**, the damage to such property being $1,000 or greater, in violation of Section 806.13(1)(a) and (b)3., Florida Statutes. . . .

(Ex. A at 3–4).

Seven months prior to trial, the State filed a motion in limine seeking to limit the defense in the following regard:

> 1. The Defendant be precluded from asserting the defense that his property was wrongfully sold by the Sheriff's Office.  Based on the documents provided in reciprocal discovery to the State, the State believes the defense will be that the levy on the properties was based on wrongfully assessed monies or fees, the levy should never have been placed on the properties and the final sale by the [S]heriff was also improper.  These arguments are all irrelevant to this case.  The only issue in this case should be whether or not the Defendant was the owner of the properties in question on December 6, 2006, when he allegedly entered the premises and did the damage.
>
> . . . .
>
> 6. No reference to self-serving hearsay statements of the [D]efendant.  *Fagan v. State*, 425 So. 2d 214 (Fla. 4th DCA 1983).

(Ex. A at 53–54).  The trial court held a hearing on the State's motion (*id.* at 23–112).  Petitioner informed the court that the theory of his defense was that he did not commit the crimes, but the issue of the legality of the sheriff's sale "may be part of my theory" (*id.* at 57–58).  The trial court clarified with Petitioner that the issue of whether the property was owned by another was an element of the offenses and an issue for the jury to decide (*id.* at 57–59).  The court inquired of the prosecutor what evidence she had that condominium units 310 and 319 were owned by someone other than Petitioner (*id.* at 59).  The prosecutor stated she had a certificate of sale from the sheriff's sale, a receipt showing the date and time of the sale, the sheriff's deed from the sale of the condominium units dated December 6, 2006, and testimony from a witness that Petitioner was present at a sheriff's sale (*id.* at 59–64, 67–68).  The prosecutor explained, and Petitioner did dispute, that a final judgment was previously entered against him in a civil case, and in October of 2006, the judgement creditor levied on Petitioner's property (*id.* at 60–64).  Petitioner additionally did not dispute that the sheriff's sale of the condominium units occurred on December 6, 2006 (*id.* at 63–64).  However, Petitioner then revealed that on March 20, 2007, after the sheriff's sale, he "deeded" the property to a mortgage holder (*id.* at 65).  He stated that part of his defense may be that

he was the "title holder" of the property even after the sheriff's sale, which proved that he had ownership of the property (*id.* at 65–67).   The court questioned Petitioner as to the evidence he intended to present to demonstrate that he owned the property, and the following discussion ensued:

> THE DEFENDANT:  Well, the question is whether or not—if I were going to argue that, which I don't even believe I am.
>
> THE COURT:  Okay.
>
> THE DEFENDANT:  I'm just trying to—I want to know the time and date that they say that they owned that property.  And I'm assuming that they're saying it was 10:00 on December 6, 2007 [sic] [the time of the sheriff's sale].
>
> THE COURT:  It would have been at the time that—
>
> THE DEFENDANT:  Is that correct, is that my assumption [sic]?
>
> THE COURT:  Whenever they got that sheriff's deed they were the owner.
>
> THE DEFENDANT:  Okay.  When they got the deed.  See, the deed wasn't recorded until the following day.
>
> THE COURT:  No, when they got it.  They're the owner when they get it not when they record it.
>
> THE DEFENDANT:  Okay, fine.
>
> THE COURT:  Recording is for public record purposes.
>
> THE DEFENDANT:  Okay.  So they got it on December 6, 2007 [sic].
>
> THE COURT:  Okay.
>
> THE DEFENDANT:  Okay.
>
> . . . .
>
> MS. SIMON [the prosecutor]:  . . . [I]n one of the statements he [Petitioner] made in the C-4 motion to dismiss was that—his argument was going to be that . . . the damage was done between the 6th of  December, after the sale, but before the 4:39, 7th of December recording of it.  Now—
>
> THE COURT:  That doesn't make any difference.

MS. SIMON:  Right.  They [the purchaser at the sale] are the owner.

THE COURT:  The owner becomes the owner when they buy something.

THE DEFENDANT:  Well, to help her out, I'm not going to that at all.

THE COURT:  Wait just a second.  An owner does not become an owner when their deed is recorded.  An owner becomes an owner when they acquire the interest in it. . . .  The recording does not create the ownership interest.  The acquisition of the ownership interest creates it.

THE DEFENDANT:  And part—I wouldn't dispute that except—

THE COURT:  Okay.

THE DEFENDANT:  —that if there was a subsequent deed at the same time to a different owner and that was recorded, I can guarantee the one that's recorded is going to be acknowledged.

THE COURT:  Deed by whom?

THE DEFENDANT:  Well, if there was a subsequent—I'm just saying hypothetically, okay, if the sheriff deeded it to Mr. X and then deeded it to Ms. Smith.  Mr. X got his deed first, let's just say it was 10 days before.

THE COURT: I'm sorry.  Back up again.  You're saying if what happened?

THE DEFENDANT:  Hypothetically.

THE COURT:  Okay.

THE DEFENDANT:  Because you were saying that the recorded deed doesn't mean anything.  That's—

THE COURT:  I didn't say it doesn't mean anything.

THE DEFENDANT:  Well—

THE COURT:  I said that's not what creates the ownership interest.

. . . .

THE DEFENDANT:  I don't want to get too sidetracked, Your Honor.

MS. SIMON:  This is what I don't want to go into [at trial].

THE COURT:  And we're not going to.

THE DEFENDANT:  Believe me we're not going to.

THE COURT:  We're not going to during the trial.

THE DEFENDANT:  I don't intent to.  I didn't intend to.

. . . . .

THE COURT:  State's asking the Defendant be precluded from asserting the defense that it was—that there was a wrongful levy and execution.

There's been no legal action apparently to set that execution aside.

THE DEFENDANT:  Well, but there has—

THE COURT:  Is that correct?

THE DEFENDANT:  There has.

THE COURT:  Okay.

THE DEFENDANT:  In a short roundabout way, Your Honor.

THE COURT:  In what case?  There's no roundabout way of doing it.

THE DEFENDANT:  Well—

THE COURT:  In what case was it done?

THE DEFENDANT:  In my business there is because I was involved with subsequent foreclosure.

THE COURT:  What's the case number in which you filed a complaint for a declaratory judgment or—

THE DEFENDANT:  I didn't file a declaratory judgment because the foreclosure of these properties were still pending with the mortgage holder, okay, and trying to resolve it [sic].

THE COURT:  That's all—all they're doing is foreclosing your interest.

THE DEFENDANT:  Well, you're asking me–

THE COURT:  This levy—

THE DEFENDANT:  Well, the interest—

THE COURT:  Just a moment.  Just a moment.

THE DEFENDANT:  All right.

THE COURT:  The sale would have been subject to those mortgages, and they could still foreclose those if they chose to.

THE DEFENDANT:  I understand that.

THE COURT:  And this owner that bought during the levy would have to decide do they want to pay those off to keep the property or not.

THE DEFENDANT:  And I understand all that.

THE COURT:  Okay.

THE DEFENDANT:  And as part of the settlement, okay, which what this person did is go there and then he disputed the mortgages, whether there was even mortgages on the property.  I understand that.  I'm just saying.

THE COURT:  I don't care.  He can do that.

THE DEFENDANT:  But then I then transferred my interest.

THE COURT:  You had no interest at that point.  If it was levied upon—

THE DEFENDANT:  But that's argument—

THE COURT:  —and there was a sale, your interest was terminated, so—

THE DEFENDANT:  Well, that's—

THE COURT:  If you tried to create some paper trail to screw things up later, that does not create an ownership interest.
. . . .
        THE DEFENDANT:  But how do we know or how does the Court know that the sheriff had the legal right to come in there and do that?  And that may be an argument that I have, a legal argument, to say that he couldn't even have done what he did, I mean, I don't know.

THE COURT:  It's been recorded, okay, and they've got record title.

. . . .

THE COURT:  So we're not going to get into issues as to whether or not it was done properly because there isn't—and I can't cite to it, but I know there's a mechanism by which to challenge a public sale.  And if it's not done—

THE DEFENDANT:  Well, but see, I still have that right.  The time hasn't expired for that.  I mean those cases are still pending, see.  Just because I haven't acted, okay, and filed something, that doesn't mean that I've given up my right to do so.

THE COURT:  What cases are still pending?

THE DEFENDANT:   These foreclosure hearings with the mortgage company.

. . . .

THE COURT:  . . . That's an ancillary proceeding . . .

. . . .

MS. SIMON:  My understanding of the case law . . . is that there's 10 days to challenge the validity of the sheriff's sale.

THE COURT:  Right.  And was that done?  You don't challenge it by executing a deed.

. . . .

THE DEFENDANT: What I'm trying to assert to the Court, okay, is whether or not, when there was a lis pendens filed in those cases, those foreclosures, that the sheriff could then conduct a sale of my property without a final hearing from the Court as to the disposition of my property.

. . . .

THE DEFENDANT:  . . . And like I said, it's not really going to be an argument.  She brought the motion.

. . . .

THE COURT:  All right.  So then you're not going to go into it?

THE DEFENDANT:  I didn't intend to.

THE COURT:  Then don't go into any complaints about the legitimacy of the sale process itself without obtaining permission from the Court first to do that, okay?

THE DEFENDANT:  I did not intent to do that—

. . . .

THE DEFENDANT:  Your Honor, if I can just on one thing on that issue. Can I go into the method in how he actually acquired the property?

>     THE COURT:  No.  All the State's got to do is prove that there was a
> sheriff's deed, that it was recorded and that there was no action to set that deed aside
> and show—they don't actually even have to show that it's recorded, but show that
> there was a sheriff's deed.  There was no action within the 10 days to set it aside.
> And they don't even have to show that.  That would be an affirmative defense, to
> show that it had been set aside.

(Ex. A at 69–81).

>     Petitioner represented himself at trial.  During opening statements, he told the jury:

>     As Ms. Simon previously stated, I was the owner of Units No. 310 and 319
> on December 6, okay, prior to the auction sale.

>     The sheriff sale took place at 10 o'clock.  I was present at the sale.  I saw who
> purchased the property or I thought I saw who purchased the property because I
> didn't see any receipt.  I just happened to stand there.  They started the auction.
> They read out a big, long list of things related to the properties that I owned and they
> conducted the sale and then I walked off.

>     So—but up until that point I was the owner of the properties.
>     . . . .
>     They've claimed that on December 6, in the evening of December 6 and
> according to their witnesses, I entered this property at sometime in the evening
> according to their witnesses.  Okay.  I claim I have an alibi on that date.  In fact, I
> claim I have an alibi that I can almost tell you where I was almost every second of
> that day.  I can verify either by telephone records, receipts at cleaners, receipts from
> Office Depot, and there are some of the evidence that you'll hear me testify to on the
> witness stand.

(Ex. C at 157–58).  The remainder of his opening statement focused solely on his alibi defense (*id.*
at 158–180).

The State's first witness was Ms. Minshew, a real estate attorney (Ex. D at 184–88).  She
testified that she represented the Bayou Breeze Condominium Association in litigation against
Petitioner (*id.* at 186).  She testified Petitioner failed to pay homeowner's dues and condominium
assessments, so the association obtained a judgment against him and levied the property (*id.*).  Ms.
Minshew testified that under Florida law, Petitioner had an opportunity to redeem the property
before it was sold at the sheriff's sale (*id.* at 187).  She testified the property owner's right to redeem
the property ends once the sheriff's sale is over (*id.*).  Ms. Minshew testified Petitioner's interest in
each condominium unit was sold at the sheriff's sale (*id.*).  She testified she was present at the sale

and saw Petitioner there (*id.* at 187–88).  Ms. Minshew testified Charles Cross, as trustee for a trust, was the highest bidder at the sale (*id.* at 188).  During cross-examination, Petitioner questioned Ms. Minshew regarding the truth of her statement that the nature of the civil judgment was his failure to pay the condominium dues (*id.* at 189).  The State objected on the basis of the pre-trial ruling, and during a bench conference, the judge reminded Petitioner that he was precluded from presenting evidence on the issue of whether or not the civil judgment should have been entered (*id.* at 189–92). Petitioner agreed to "move on" (*id.* at 192).

Connie Bonner, a judicial enforcement levy analyst for the Escambia County Sheriff's Office, testified regarding the procedures leading up to, during, and after a sheriff's sale of property (Ex. D at 213–15).  She testified she was present at the sheriff's sale of units 310 and 319 (*id.* at 215).  She identified the receipt provided by the sheriff's office to Mr. Cross, the highest bidder, on the date of the sale, indicating he paid $1,000.00 on December 6, 2006 (State's exhibit 1) (*id.* at 216).  She also identified the sheriff's deed she prepared subsequent to the sale (State's exhibit 2) (*id.* at 216–17).  She testified regarding two dates that appeared on the deed; the October 23, 2006 date was the date the levy was imposed on the property, and the December 6, 2006 date was the date the sheriff signed the deed (*id.*).  She testified it was part of her job duties to actually find the sheriff and secure his notarized signature (*id.* at 217).  The documents were admitted into evidence (*id.*). During cross-examination, Ms. Bonner testified the sale occurred at 10:00 a.m. on December 6, 2006 (*id.* at 217–18).  Petitioner asked her whether the person who owned the property prior to the sheriff's sale was deemed the legal "owner" of the property until the sale, and she responded that according to legal counsel for the civil division of the sheriff's office, the property conveyed to the new owner "at the time of the sale to the successful bidder" (*id.* at 220–21).  In response to several questions by Petitioner, Ms. Bonner repeated her testimony that the previous owner would still have been the owner until the sale on December 6 (*id.*).  She also reaffirmed her testimony that she "was in charge of tracking down the sheriff" (*id.* at 219).  Ms. Bonner testified that after the sale, she realized an eviction proceeding had occurred with relation to one of the units (*id.* at 223–24).

Jeffrey Panella testified he was a tenant of unit 319, but Petitioner evicted him from the unit (Ex. D at 238–39).  He testified he surrendered his keys to Petitioner between 10:00 and 11:00 a.m. on December 6, 2006 (*id.* at 239).  He testified after he surrendered his keys, he never went back in

the unit (*id.*).  He additionally stated at the time he left the unit, there was no damage to the interior (*id.*).  He testified the carpet was not cut, and the fan blades were attached to the ceiling fans (*id.*).  Mr. Panella testified that at approximately 12:30 p.m. on December 6, he saw Petitioner talking to a sheriff's deputy (*id.* at 242, 263).  He testified that between 7:00 and 8:00 p.m. on the night of December 6, Charles Cross came to his (Panella's) new apartment, unit 120, and inquired whether Panella would be interested in doing remodeling work on units 310 and 319 (*id.* at 242–44).  Panella testified that approximately 10:00 or 10:30 a.m. on December 7, 2006, Ms. Charlene Busbee, his new landlord, asked him to change the locks on units 310 and 319, because Petitioner had told another resident, Matt Brown, he wanted to remove the appliances from the units (*id.* at 258–59).  Panella testified he went to unit 319 on the morning of December 7, 2006, and observed it was damaged, and then went to unit 310 and saw it was damaged in the same way (*id.* at 244).  He identified pictures of the damage and described part of it (he stated the carpet was ripped and the door hinges were destroyed with a drill) (*id.* at 244–46).  Mr. Panella testified he prepared an estimate for Mr. Cross to repair the damage, and it totaled $11,000.00 for each unit (*id.* at 245).

David Carroll, a deputy with the Escambia County Sheriff's Office, testified he went to serve a writ of possession for unit 319 on December 6 at approximately 12:30 p.m. (Ex. D at 264–67).  He testified that a final judgment of possession and a writ of possession (State's exhibits 31 and 32) were issued December 4, 2006, placing Petitioner in possession of the unit, as a result of an eviction proceeding Petitioner initiated against Jeffrey Panella (*id.*).  Deputy Carroll testified Petitioner did not mention to him that the unit had been sold at a sheriff's sale earlier that day (*id.* at 268).  He additionally testified he walked through unit 319 at 12:30 p.m., and the unit was not damaged as it was in the pictures (*id.* at 267–68).  On cross-examination, Deputy Carroll testified Petitioner provided him the key to unit 319 when he walked through the unit to make sure no one was inside (*id.* at 269).  He testified after he observed the unit, he obtained Petitioner's signature on certain documents acknowledging that Petitioner received possession of the unit (*id.* at 269).  Deputy Carroll testified that at 12:30 p.m. on December 6, 2006, he placed Petitioner in possession of unit 319 (*id.* at 271–72).

Charles Cross testified he and Bobby Joe Trammel are trustees for the Dayne Family Trust (Ex. D at 282–84).  He testified he attended the sheriff's sale of units 319, 310, 214, and 202, and

was the successful bidder of all four units (*id.* at 284).  He testified he paid $1,000.00 for the units at the sale (*id.* at 285).  He testified he went to units 310 and 319 after the sale and observed that the units were undamaged (*id.* at 285–86).  Mr. Cross testified that when he visited Mr. Panella between 6:00 and 8:00 p.m. that evening, he saw Petitioner open the door to unit 310 and push it open with his elbow (*id.* at 288, 297, 300–02).  He testified he did not attempt to contact Petitioner, because his attorney told him to avoid any confrontation with him (*id.*).  He testified he went to the units the next morning and observed the damage depicted in the pictures, including, damage to the carpet, holes drilled in the refrigerator door, holes drilled in the stove, the stove's heating coils bent outward, holes drilled throughout the cabinet doors, fan blades torn off the ceiling fans, holes drilled in doors and walls, holes drilled in the air conditioning unit, and window blinds torn down (*id.* at 290–94).  On cross-examination, Petitioner asked Mr. Cross what prompted him to change the locks on the units, and he responded he received a call from his property manager, Charlene Busbee, who stated she had been notified by the tenant of unit 202, Matt Brown, that Petitioner told him on the evening of December 6, that he intended to remove the refrigerator, stove and other appliances from the units (Ex. E at 382–84).

Nicholas Petkovic testified that between 8:00 and 9:00 p.m. on December 6, 2006, he was at the condominium swimming pool and saw Petitioner standing in front of the door of unit 319 with a bag and then entering the unit and closing the door (Ex. E at 391–94, 405).  He testified that just prior to seeing Petitioner enter unit 319, he saw Mr. Panella and Mr. Cross standing at Mr. Panella's unit, and then Panella walked back into his unit, and Mr. Cross walked across the street (*id.* at 398–401).  Mr. Petkovic testified he did not see Petitioner leave the unit during the 10–15 minutes he remained at the swimming pool (*id.* at 405).  Mr. Petkovic testified that on the morning of December 7, he told Charlene Busbee he had seen Petitioner go into the unit the night before (*id.* at 394).

The State's final witness was Erik Goss, a detective with the Pensacola Police Department (Ex. E at 411).  He testified he investigated the burglaries of units 310 and 319 and spoke to Petitioner as part of his investigation (*id.* at 411, 413).  He testified Petitioner told him the units were his property (*id.* at 413).  Detective Goss asked Petitioner why he put holes in the appliances, and Petitioner responded he did it because he was remodeling (*id.*).  Petitioner also told Goss several

times that he could do what he wanted with the units because he owned them, and he did not deny "doing this" (*id.* at 413–14, 447).  He told Detective Goss that he had received a writ advising him he could enter unit 319 (*id.* at 413).  Detective Goss testified that during the two conversations he had with Petitioner, Petitioner never told him he could not have done the damage because he was not at the property, nor did he tell Goss he had witnesses to prove where he was when the damage was done (*id.* at 446).

Petitioner testified on this own behalf (Ex. E at 478–526).  He testified he currently resided in unit 217 of Bayou Breeze Condominiums (*id.* at 478).  He stated he was employed by Howell Holding, Incorporated, a home improvement finance seller licensed to provide home improvement financing (*id.*).  He testified he was also a shareholder of King's Home Improvement, LLC, a company that provided home improvement services (*id.* at 479).  As part of his duties with those companies, he met with customers to sell home improvements services and financing for those improvements (*id.*).  He testified he sometimes financed the projects himself, and sometimes collected money from the customers by going to their homes in the evening (*id.* at 479–80). Petitioner described in detail his activities from 6:30 a.m. on December 6 to 9:00 a.m. on December 7 (*id.* at 480–522).  He admitted he attended the sheriff's sale of the units at 10:00 a.m. on December 6 (*id.* at 481–82).  He testified that after the sheriff's sale, he called a person who held mortgages on the units and told him the property had been purchased and the sale was concluded, but he did not know the identity of the purchaser, although in all likelihood it was Mr. Cross (*id.* at 489–90). He testified he met Deputy Carroll at approximately 12:30 p.m., and told Carroll that the tenant had moved out of unit 319 (*id.*).  Petitioner testified, "I believe I signed something putting me back in possession of the property" (*id.* at 494).  Petitioner testified that between 3:20 p.m. and 3:28 p.m. on December 6, 2006, he called Anthony Kennedy and left a message that he (Petitioner) would stop by Kennedy's house later that evening to collect a payment (*id.* at 498–99).  Petitioner then called Bonnie Butler and arranged to pick up a payment form her later that evening (*id.* at 499).  Petitioner testified to other activities during that day, including dropping off dry cleaning and shopping at an office supply store, and receipts from those stores were admitted into evidence (*id.* at 496, 50–03). He stated he was at home from 4:00–6:00 p.m., collecting records to supply in response to a subpoena, and the subpoena was admitted into evidence (*id.* at 503–05, 514).  He testified he left

his home at 6:00 p.m. and drove to Bonnie Butler's house, arriving at approximately 6:20 p.m. (*id.* at 505–06). He testified he collected a payment from her and recorded the payment in the checkbook register of his account for Howell Holding, Incorporated (*id.* at 506–07). He testified that at 6:30 p.m., he drove to Anthony Kennedy's house, but he was uncertain whether he actually saw Kennedy that night (*id.* at 508–09). Petitioner testified he drove home and arrived at approximately 7:15 p.m. (*id.*). He testified he remained home, compiling information relating to the subpoena, and went to sleep at 9:30 or 10:00 p.m. (*id.* at 509–10). Petitioner testified he deposited Bonnie Butler's check at the bank at 9:01 a.m. the next morning, and the receipt for that deposit was admitted into evidence (*id.* at 515–16, 522).

Outside the presence of the jury, Petitioner proffered the account logs of Anthony Kennedy and Bonnie Butler (proposed defense exhibits 11 and 12) and two checkbook registers (proposed defense exhibits 14 and 15) (Ex. E at 512–15). Petitioner stated he created the entries in the accounts logs and checkbook registers (*id.* at 513). The following discussion ensued:

> THE COURT: All right. So there's an issue as to hearsay and there's an issue as to relevance.
> . . . .
> THE COURT: What's the purpose of offering these documents into evidence?
>
> THE DEFENDANT: Well, I've put a notice in that I have an alibi.
>
> THE COURT: What's the purpose of offering the account logs into evidence?
>
> THE DEFENDANT: The purpose is to establish who I am and what I was doing, okay, on that particular date. I mean, there's a record of me recording her payment on my account log, that I received it—
>
> THE COURT: Okay. There's a document that you say you prepared. So then we've got the issue of it being an out-of-court statement offered to prove—the account log itself? I really don't see relevance of the account logs or the checkbook registers. . . .
> . . . .
> THE COURT: Exhibits 11, 12, 14, and 15, though, there are two problems with them: One is that they're a statement of the defendant, an out-of-court statement of the defendant. Whether the entry was or was not made is really not

relevant, and I don't think it's even in dispute whether an entry was or was not made. You testified that you made the entries, and so that's in evidence. And I don't think the State is disputing whether you did or you didn't make the entries. But the logs themselves and the checkbook registers themselves really are—don't tend to prove or disprove any material issue in this case, and it doesn't tend to prove or disprove the alibi.

       You've already offered testimony that you wrote things down. So I'm going to sustain the objection to Exhibits 11, 12, 14, and 15.

(*id.* at 514–15).

Petitioner's testimony resumed, wherein he denied he confessed to Detective Goss that he damaged the units (Ex. E at 523–24). On cross-examination, Petitioner admitted that he "lost" four properties on December 6, 2006, pursuant to the sheriff's sale (*id.* at 528). He admitted he did not inform the judge in the eviction proceeding involving unit 319 that a sheriff's sale was scheduled for the unit on December 6, nor did he tell Deputy Carroll that the property had been sold (*id.* at 529).

Petitioner presented testimony from witnesses regarding his activities on December 6, including Bonnie Butler and Anthony Kennedy (Ex. E at 544–570). Bonnie Butler testified Petitioner was at her home between 6:00 p.m. and 7:00 p.m. (*id.* at 562, 565). Anthony Kennedy testified that "somewhere around" December 6, Petitioner came to his house between 4:30 and 5:30 p.m. (*id.* at 569–70). He did not recall whether he paid Petitioner that night (*id.*). The jury convicted Petitioner as charged after less than three hours of deliberations (*see* Ex. B at 252).

As previously discussed, Petitioner argued on direct appeal that the trial court's exclusion of evidence regarding the validity of the sheriff's sale and exclusion of the account logs and checkbook registers deprived him of his right to present a complete defense (Ex. G). The First DCA summarily affirmed the judgment of conviction and sentence.

       b.    <u>Discussion</u>

Initially, Petitioner failed to demonstrate that the First DCA applied a rule that contradicts a specific Supreme Court holding on the issue at hand. He further failed to establish that the state court confronted a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrived at a result different from Supreme Court precedent. Therefore, he

is not entitled to relief under the "contrary to" provision of § 2254(d)(1).  *See* Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).

Additionally, Petitioner failed to establish he is entitled to relief under the "unreasonable application" prong of § 2254(d)(1).  As previously discussed, when faced with a state appellate court's summary affirmance of a trial court's decision, the "unreasonable application" prong focuses on the state court's ultimate conclusion, not the reasoning that led to it.  *See* Gill,  633 F.3d at 1287 (citing Harrington, 131 S. Ct. at 786).  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See* Harrington, 131 S. Ct. at 786; *see also* Gill, 633 F.3d at 1292 (holding that the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

With regard to the trial court's exclusion of evidence regarding the propriety or validity of sheriff's sale of the condominium units, the First DCA's rejection of Petitioner's claim could have been based on the theory that the trial court's ruling did not prevent Petitioner from presenting evidence supporting an ownership defense (Petitioner, however, did not pursue such as defense, as discussed *infra*).  It must be emphasized that the trial court prohibited only the presentation of evidence or argument concerning the validity of the sheriff's sale.  The trial court did not limit the presentation of evidence regarding whether Petitioner owned, that is, had a superior possessory interest to, the condominium units at the time they were entered and damaged.[9]  Indeed, the state court record shows that at a pre-trial hearing subsequent to the hearing on the State's motion in limine, the trial court explicitly stated that the issue of whether ownership had changed hands by the

---

[9] The Florida Supreme Court explained that the ownership element of burglary is not the same as ownership in property law, but instead means "any possession which is rightful as against the burglar," and this element is satisfied by "proof of special or temporary ownership, possession, or control."  D.S.S. v. State, 850 So. 2d 459, 461 (Fla. 2003).  This is true regarding the ownership element of criminal mischief as well.  *Id.* at 461–62.  The crime of burglary involves a disturbance to possession or habitable security and not to the fee.  *See* In re M.E., 370 So. 2d 795, 797 (Fla. 1979).

time the property was damaged was an issue of fact to be decided by the jury (Ex. A at 166). Despite this explicit clarification that the parties were permitted to present evidence on the issue of ownership, Petitioner chose not to pursue this defense at trial.  During his opening statement, he outlined only an alibi defense (Ex. C at 157–80).  During his cross-examination of Connie Bonner, Petitioner elicited testimony that he was the owner of the units until the sheriff's sale.  During the presentation of his defense, Petitioner presented evidence only on the alibi defense, not the issue of ownership (Ex. D at 220–21).  Finally, during closing argument, Petitioner argued only the alibi defense (Ex. F at 610–21).  He conceded he owned the units and had the legal right to access the units prior to the sheriff's sale, and he argued it was unreasonable and illogical to believe he would engage in the risky behavior of entering the units after the "new owner" purchased them (id. at 619–21).  He argued that it made more sense that Mr. Cross and Mr. Petkovic lied about seeing him enter the units on December 6 (id. at 620–21).

The First DCA could have also based its rejection of Petitioner's claim on the theory that any probative value of evidence suggesting the sheriff's sale was improper or invalid was outweighed by its potential to confuse or mislead the jury on the issue of whether Petitioner "owned" the properties, as that term is used in Florida's burglary statute, at the time they were damaged.

With regard to the trial court's exclusion of the account logs and checkbook registers, the First DCA's decision could have been supported by the argument that any probative value of the account logs and checkbook registers was diminished, if not completely eliminated, by their unreliability, since Petitioner created the records himself, the records were out of court statements offered for the truth of the matters included therein, that is, that Petitioner received a certain payment from a certain person at a certain time,[10] and Petitioner did not argue to the trial court that the records qualified under an exception to the hearsay rule.[11]  The First DCA's decision could also have

---

[10] Petitioner concedes he was offering this evidence for the purpose of corroborating his testimony regarding his personal activities at specific times on the day in question (see doc. 64 at 21–32).

[11] The account logs were not admissible as records of regularly conducted business activity, because Petitioner did not state that the entries were created at or near the time the payments were collected, as required for admission under the business records exception.  See Fla. Evid. Code § 90.803(6)(a).  Although Petitioner testified that he recorded the payment from Bonnie Butler in his checkbook register after he collected the payment, there is no indication in the record that the checkbook register included the time the transaction was recorded (Ex. E at 506–07).  Further, both Petitioner and Anthony Kennedy testified they could not recall whether Petitioner actually collected a payment from Kennedy on

been supported by the theory that exclusion of the accounts logs and checkbook registers did not prevent Petitioner from presenting an alibi defense.  The jury heard extensive evidence, in the form of Petitioner's testimony, documentary evidence (receipts from a dry cleaner and an office supply store, a subpoena for a deposition, and a receipt from a bank deposit), and witnesses' testimony, of Petitioner's every activity during the time period in question.  Indeed, the jury heard all the relevant details of the charged offenses from Petitioner's perspective; he freely exercised his choice to convey his version of the facts at trial.

In sum, the trial court's evidentiary rulings did not significantly undermine fundamental elements of Petitioner's alibi defense, which was the only defense he pursued at trial.  It is possible that fairminded jurists could disagree that the First DCA's rejection of Petitioner's due process claim, based upon the trial court's evidentiary rulings, is inconsistent with Chambers, but that only strengthens the undersigned's determination that the First DCA's adjudication was not an unreasonable application of Chambers.  Therefore, Petitioner is not entitled to federal habeas relief on Grounds One and Three.

     B.     Ground Four: "Prosecutorial misconduct.  Prosecutor failed to follow proper procedure under rule of discovery withholding material evidence in possession of law enforcement officials that was withheld from Petitioner by the prosecutor Kelly Simon in violation of Petitioner's procedural due process rights which prevented the petitioner from establishing he was the owner of the two condominiums on the date of the alleged offenses which: a) unequivocally proved the alleged victim was not the owner of the two condominium units, but rather, the two units were owned by the Petitioner on the date of the alleged offenses, and b) the favorable suppressed impeachment evidence effectively refutes the government's key witness Connie Bonner's testimony concerning her recollection of when and in the manner in which on December 7, 2006 Escambia County Sheriff Ron McNesby signed a sheriff's deed conveying title to the Petitioner's two condominium units."

Petitioner states he filed a notice of discovery on January 4, 2007 (doc. 44 at 7–11, 28–40).

He states he contacted the Escambia County Sheriff's Office prior to trial and requested a copy of any "log" that would indicate the date the sheriff executed and delivered the sheriff's deed from the sale of the property (id. at 7).  Petitioner states the sheriff's office told him they did not keep a log that would indicate the date the sheriff executed the deed (id.).  Petitioner states on August 2, 2007,

---

December 6.  This testimony casts grave doubt on the reliability of an entry in Petitioner's checkbook register indicating he collected a payment from Kennedy on December 6.

the prosecutor sent him a letter stating, "I have complied with all discovery requirements . . . I have also provided all documents . . . . I am not in possession or aware of any hand written or audio recorded witness statements" (*id.* at 7, 45).  Petitioner states on or about May 7, 2010, Lisa Minshew, one of the trial witnesses, obtained numerous documents from the Sheriff's Office through a public records request and provided a copy of the documents to Petitioner (*id.* at 7–8).  The documents included the sheriff's receipt showing that the purchaser received the sheriff's deed on December 7, 2006 at 3:00 p.m., and an "Execution Action Taken Sheet" showing that Connie Bonner did not have possession of the signed sheriff's deed on December 6, 2006, allegedly contrary to her trial testimony (*id.* at 8–9, 47, 49–50).

Petitioner contends his defense was "handcuffed" by the prosecutor's failure to disclose the Sheriff's Office Execution Action Taken Sheet and the sheriff's receipt showing when the purchaser received the sheriff's deed (*id.* at 28).  He contends these two documents would have (1) exculpated him of the crimes, because they demonstrated that the new ownership did not take effect until December 7, 2006, and (2) impeached Connie Bonner's testimony concerning the date the deed was signed by the sheriff and delivered to the purchaser (*id.* at 28–32).  He contends the prosecutor's withholding disclosure of the Execution Action Taken Sheet and the sheriff's receipt prevented him from proving he owned the condominium units when the units were burglarized and damaged (*id.* at 29–38).  He also argues the prosecutor violated <u>Giglio</u>,[12] because she knowingly presented Connie Bonner's false testimony regarding the date the sheriff's deed was signed and delivered, and failed to correct the false testimony (*id.* at 38–40).

Petitioner states he raised the <u>Brady</u> claim as Claim V in his amended Rule 3.850 motion (*id.* at 10–11).

Respondent concedes Petitioner raised the <u>Brady</u> claim in his amended Rule 3.850 motion (doc. 55 at 21).  Respondent contends the state court found that, as a matter of state law, Petitioner's interest in the property, for purposes of the burglary statute, was extinguished by the October levy and the purchaser's payment at the December 6 sheriff's sale (*id.*).  Further, the evidence supported the trial court's determination that the deed was signed by the sheriff on December 6, but perhaps

---

[12] <u>Giglio v. United States</u>, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

was not delivered until the next day (*id.*).  Respondent contends the state court reasonably concluded the "new evidence" was not relevant to the ownership issue; therefore, it was not material and its absence did not prejudice Petitioner (*id.* at 21–22).

    1.  <u>Brady</u> claim

      a.  Clearly Established Federal Law

   In <u>Brady v. Maryland</u>, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  The State has an obligation to disclose all exculpatory evidence within its constructive knowledge, including "evidence known to others acting on the government's behalf in the case, including the police."  <u>Kyles v. Whitley</u>, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

   Three elements establish a <u>Brady</u> violation:  (1) the evidence must be favorable to the accused, because it is either exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be material so as to establish prejudice.  <u>Banks v. Dretke</u>, 540 U.S. 668, 691, 124 S. Ct. 1256, 157 L. Ed. 2d 1166 (2004).  The State's duty to disclose pertains only to evidence that is advantageous to the defense, including impeachment evidence, and which, if suppressed, would deprive him of a fair trial.  <u>United States v. Bagley</u>, 473 U.S. 667, 675, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985).  "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."  <u>Giglio v. United States</u>, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (citing <u>Napue v. Illinois</u>, 360 U.S. 264, 269, 79 S. Ct. 1173, 1177, 3 L. Ed. 2d 1217 (1959)).  The prejudice or materiality requirement is satisfied if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  <u>United States v. Bagley</u>, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985) (quotation marks omitted); *see also* <u>Kyles v. Whitley</u>, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490 (1995).  Materiality is determined by asking whether the government's evidentiary suppressions, viewed cumulatively, undermine confidence in the guilty verdict.  *See* <u>Kyles</u>, 514 U.S. at 434, 436–37 & n.10; *see also* <u>Hammond v. Hall</u>, 586

F.3d 1289, 1305–06; Smith v. Sec'y, Dep't of Corr., 572 F.3d 1327, 1334 (11th Cir. 2009).  For

purposes of federal habeas, a state court's determination of "materiality" for purposes of a Brady

claim is a question of law not entitled to a presumption of correctness.  Moon v. Head, 285 F.3d

1301, 1310–11 (11th Cir. 2002).

b.      Federal Review of State Court Decision

Petitioner raised his Brady claim as Claim V in his amended Rule 3.850 motion (Ex. U at

67, 80–83, 99–07, 115–24).  The state court adjudicated the claim as follows:

> There is no reasonable probability that had these notes [the Execution Action
> Taken Sheet] been introduced into evidence the Defendant would have been
> acquitted.  As the Court will explain, the "execution action taken sheet" submitted
> is not material and the Defendant was not prejudiced by the document not being
> submitted into evidence at trial.

> It is true that "ownership of the building or structure is a material element of
> the crime of burglary."  R.J.K. v. State, 928 So. 2d 499, 502 (Fla. 2d DCA 2006).
> Ownership is also an element of the crime of criminal mischief.  D.S.S. v. State, 850
> So. 2d 459 (Fla. 2003).  The Florida Supreme Court has explained that the
> "ownership element in burglary is not the same as ownership in property law but,
> rather, means 'any possession which is rightful as against the burglar and is satisfied
> by proof of special or temporary ownership, possession, or control.'"  D.S.S., 850 So.
> 2d at 861.  In this case, the record is exceedingly clear that the Defendant did not
> "own" these condominiums at the time of the crimes so as to avoid criminal liability
> for burglarizing the condominiums and causing extensive property damage therein.

> It is *uncontested* that the condominiums at issue were sold at a Sheriff's sale
> on December 6, 2006.  Attachment 1 [trial transcript] at 282–85, 528.  Connie
> Bonner, a judicial enforcement levy analyst, testified at trial.  Ms. Bonner testified
> that the Sheriff's deed regarding the properties was signed by the Sheriff on
> December 6, 2006.  Attachment 1 at 215–17.

> The Defendant's claim that the Sheriff did not sign the Sheriff's deed until
> December 7, 2006 is without merit.  Initially, the record plainly reflects that the
> Sheriff signed the deed on December 6, 2006.  Attachment 1 at 215–17; Attachment
> 5 [sheriff's deed].  Contrary to the Defendant's assertions, the "execution action
> taken sheet" attached at the Defendant's post-conviction motion *does not* conflict
> with Ms. Bonner's testimony as to the date the Sheriff executed the deed.  The notes
> *do not* describe when the deed was signed by the Sheriff.  The "execution action
> sheet" reflects that Ms. Bonner prepared the deed for the Sheriff's signature on
> December 6, 2006 and received the deed, with the Sheriff's signature, on December

7, 2006.  The fact that Ms. Bonner *received* the signed deed on December 7, 2006 *does not* conflict with the evidence at trial that the deed was signed by the Sheriff on December 6, 2006.

On October 23, 2006, the condominiums were levied.  Attachment 1 at 215–217.  At the conclusion of the Sheriff's sale on December 6, 2006, the Dayne Family Trust purchased the condominiums at the Sheriff's [s]ale *and became entitled to a deed*.  See § 56.25 Fla. Stat (emphasis added).  In other words, once the Dayne Family Trust paid the purchased price of $1,000, any ownership interest the Defendant had in the condominiums was extinguished.  All of the Defendant's interest in the properties had been conveyed to the Dayne Family Trust.  Therefore, the record conclusively refutes the Defendant's claim that he was "owner" of the condominiums at the time the crimes were committed.  On the night of December 6, 2006, there can be no doubt that the Dayne Family Trust's possession of the condominiums was rightful as against the Defendant.  The Defendant's post-conviction claims relating to the "execution action taken sheet" at issue are without merit.

(Ex. V at 282–84).

Petitioner appealed the state circuit court's denial of his Rule 3.850 motion to the First DCA. The appellate court affirmed per curiam without written opinion.

The state court applied the correct legal standard to Petitioner's claim, thus precluding habeas relief under the "contrary to" prong of § 2254(d)(1).  Petitioner must therefore demonstrate the state court's adjudication was based upon an unreasonable determination of the facts, or was an unreasonable application of Strickland, to obtain habeas relief  See 28 U.S.C. § 2254(d)(1),(2).

Petitioner contends the state court's adjudication was based upon an unreasonable determination of the facts.  He contends the state court erroneously interpreted Florida law in concluding Petitioner did not "own" the condominiums at the time of the crimes (doc. 64 at 11–14). He argues if the state court had held an evidentiary hearing, he would have presented the results of his research of Florida law, which would have established that delivery of the deed marked the date title passed to the new owner (doc. 64 at id. at 14–23 (citing Florida cases)).  Petitioner additionally contends the state court's determination that the Execution Action Taken Sheet was not "material" for purposes of Brady was an unreasonable application of federal law (*id.* at 23–26).

Deference is due to the state court's findings on matters of state law.  *See* Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); Mullaney v. Wilbur, 421 U.S.

684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).  Therefore, this court is bound by the state court's determinations that (1) once the Dayne Family Trust paid the purchase price of $1,000 at the sheriff's sale, any ownership interest Petitioner had in the condominiums was extinguished; (2) Petitioner did not "own" the condominium units, as that term is used in the burglary and criminal mischief statutes, at the time of the crimes; and (3) on the night of December 6, 2006, the Dayne Family Trust's possession of the condominiums was rightful as against Petitioner.

As the state court determined, the Dayne Family Trust's payment of the purchase price of $1,000 at the sheriff's sale at 10:00 a.m. on December 6, 2006 divested Petitioner of ownership of the condominium units for purposes of the burglary statute.  Evidence that the signed sheriff's deed was received by Connie Bonner and the purchaser of the units on December 7 does not suggest Petitioner had a superior possessory interest in the units when they were burglarized and damaged on the evening of December 6.  Therefore, Petitioner failed to demonstrate that the Execution Action Taken Sheet and the receipt documenting delivery of the signed deed to the new owner was exculpatory.

Additionally, the Execution Action Taken Sheet and the receipt documenting delivery of the deed to Ms. Bonner and the purchaser had no impeachment value.  As previously discussed, Ms. Bonner testified she was present at the sheriff's sale of units 310 and 319 (Ex. D at 215).  She testified the sale occurred at 10:00 a.m. on December 6, 2006 (*id.* at 217–18).  She identified the receipt provided by the sheriff's office to Mr. Cross, the highest bidder, on the date of the sale, indicating he paid $1,000.00 on December 6, 2006 (State's exhibit 1) (*id.* at 216).  She also identified the sheriff's deed she prepared subsequent to the sale (State's exhibit 2) (*id.* at 216–17). (Ex. U at 330–32). Both documents were admitted into evidence (Ex. D at 217).  The sheriff's deed bears Sheriff Ron McNesby's signature and was notarized by Barbara Hamilton on December 6, 2006, with a statement that the deed was acknowledged before her on December 6, 2006 by Sheriff Ron McNesby (Ex. U at 332).  Ms. Bonner testified that the December 6, 2006 date on the deed represented the date the sheriff signed the deed (*id.* at 216–17).  The prosecutor asked, "is it part of your duties to actually go find the sheriff, Ron McNesby, to have him sign it [the deed] and have someone notarize it?" (*id.* at 217).  Ms. Bonner responded, "Yes." (*id.*).  During cross-examination,

Petitioner asked, "and as part of the execution you said that you're in charge of tracking down the sheriff, is that correct?" (*id.* at 219).  Ms. Bonner responded, "Yes, sir." (*id.*).

Neither the Execution Action Taken Sheet nor the receipt of delivery of the sheriff's deed to the new owner conflicts with Ms. Bonner's testimony that the sheriff signed the deed on December 6 (doc. 58, Exs. 2, 3).  The entries in the Execution Action Taken Sheet do not describe when the deed was signed by the sheriff; they simply reflect that Ms. Bonner prepared the deed for the sheriff's signature on December 6, 2006, forwarded it to "Barbara" for the sheriff's notarized signature the same day, and received the signed deed from Barbara on December 7 (*id.*, Ex. 2).  The Execution Action Taken Sheet and the receipt also reflect that the purchaser's representative received the deed on December 7 at 3:00 p.m. (*id.*, Exs. 2, 3).  The fact that Ms. Bonner did not possess the signed deed until December 7, 2006 does not conflict with her testimony that the deed was signed by the sheriff on December 6, 2006.

Additionally, assuming arguendo that the Execution Action Taken Sheet was weakly favorable to the defense (it would have demonstrated that Ms. Bonner did not see or possess the signed deed until December 7), it was not material.  As the state court found, the Dayne Family Trust's payment of the purchase price of $1,000 at the sheriff's sale at 10:00 a.m. on December 6, 2006 divested Petitioner of ownership of the condominium units for purposes of the burglary statute.  Evidence as to when the sheriff signed the deed, whether Ms. Bonner witnessed the signing, and when Ms. Bonner possessed the signed deed was irrelevant to the issue of whether Petitioner had a superior possessory interest in the condominium units at the time they were burglarized and damaged.  Petitioner thus failed to show a reasonable probability that, had the Execution Action Taken Sheet and receipt of delivery of the deed been disclosed to the defense, the result of the proceeding would have been different.  Therefore, he failed to demonstrate that the allegedly suppressed evidence was individually or cumulatively material.

Petitioner failed to show that the state court's denial of his <u>Brady</u> claim was based upon an unreasonable determination of the facts, or was contrary to or an unreasonable application of <u>Brady</u>.  Therefore, he is not entitled to federal habeas relief on his <u>Brady</u> claim.

        2.      <u>Giglio claim</u>

Petitioner also includes a <u>Giglio</u> claim in Ground Four.  He argues the prosecutor violated <u>Giglio</u> by knowingly presenting Connie Bonner's false testimony regarding the date the sheriff's deed was signed and delivered, and failing to correct the falsity (doc. 44 at 38–40).

Review of Petitioner's Rule 3.850 motion and amended motion demonstrates that although he presented a <u>Brady</u> claim, he did not fairly present a <u>Giglio</u> violation (Ex. U at 3–4, 46–57, 67, 80–83, 99–107, 115–24).[13]  Therefore, the <u>Giglio</u> claim is unexhausted.[14]  Further, any attempt to return to state court to present the claim in a post-conviction motion would be futile, as it would be subject to dismissal as successive.  *See* Fla. R. Crim. P. 3.850(f).[15]  Therefore, the <u>Giglio</u> claim is procedurally barred from federal review.

Notwithstanding the exhaustion issue, Petitioner's claim is without merit.  *See* 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Although a <u>Brady</u> claim and a <u>Giglio</u> claim are related, each claim is different and has its "own standard for determining whether the undisclosed evidence [was] material." <u>Guzman v. Sec'y, Dep't of Corr.</u>, 663 F.3d 1336, 1348 (11th Cir. 2011) (quoting <u>Smith</u>, 572 F.3d at 1333–34).  To establish a <u>Giglio</u> claim, a habeas petitioner must prove:  "(1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material, i.e., that there is any reasonable likelihood that the false testimony could . . . have affected the judgment." <u>Ford v. Hall</u>, 546 F.3d 1326, 1332 (11th Cir. 2008) (quotation marks omitted).  For <u>Giglio</u> violations, the defendant is entitled to a new trial "if there is any reasonable

---

[13] Although Petitioner cited <u>Giglio</u> in his original motion, he did so only in support of his <u>Brady</u> claim: "Impeachment evidence fall under <u>Brady</u> when the reliability of a given witness may be determinative of a defendant's guilt or innocence." (Ex. U at 54).  Additionally, he alleged in his amended motion that the Execution Action Taken Sheet and receipt showing delivery of the sheriff's deed to the purchaser demonstrated that Connie Bonner lied during her testimony (*id.* at 122); however, Petitioner made no allegations suggesting the prosecutor knowingly presented the allegedly false testimony.

[14] Respondent did not expressly waive the exhaustion requirement; therefore, it is not deemed waived under § 2254.  *See* 28 U.S.C. § 2254(b)(3).

[15] The factual basis for the <u>Giglio</u> claim was available to Petitioner at the time he filed his amended Rule 3.850 motion, on August 26, 2010.  Petitioner admitted in the amended motion that he received the documents (the Execution Action Taken Sheet and receipt of delivery of the deed to the new owner) in May of 2010 (Ex. U at 129).

likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976).  "The could have standard requires a new trial unless the prosecution persuades the court that the false testimony was harmless beyond a reasonable doubt." Smith, 572 F.3d at 1333–34.  Giglio's materiality standard is "more defense-friendly" than Brady's.  Guzman, 663 F.3d at 1348 (quoting Hammond, 586 F.3d at 1306 n. 4).

In the instant case, Petitioner failed to demonstrate that Connie Bonner testified falsely. Petitioner asserts Ms. Bonner lied when she testified she possessed the signed sheriff's deed on December 6, 2006.  However, Ms. Bonner did not testify to this fact.  As previously discussed, Ms. Bonner testified that the December 6, 2006 date which appeared on the deed represented the date the sheriff signed the deed (Ex. D at 216–17).  She then testified as follows:

> Q [by the prosecutor].  And is it part of your duties to actually go find the sheriff, Ron McNesby, to have him sign it and have someone notarize it?
>
> A.  Yes.
>
> . . . .
>
> Q [by Petitioner].  And as part of the execution you said that you're in charge of tracking down the sheriff, is that correct?
>
> A.  Yes, sir.
>
> Q.  And I see according to State Exhibit, I believe it is State's Exhibit No. 2 [the sheriff's deed], it says he signed it on October 23, of 2006, is that correct?
>
> A.  No, sir, he signed it on the 6th but the date of levy is what goes on the sheriff's deed.

(Ex. D at 217–20).  Ms. Bonner did not testify that she was present when the sheriff signed the deed, nor did she testify she possessed the signed deed prior to December 7.  Therefore, Petitioner failed to satisfy the first prong of the Giglio standard.

Additionally, the allegedly false testimony was harmless beyond a reasonable doubt.  The jury was presented with the sheriff's deed itself, which bears Sheriff Ron McNesby's signature and was notarized by Barbara Hamilton on December 6, 2006, with a statement that the deed was acknowledged before her on December 6, 2006 by the sheriff (Ex. U at 330–32).  Further, as the

state court determined, ownership of the units passed, for purposes of the burglary and criminal mischief statutes, when the purchaser paid the purchase price at the sheriff's sale on December 6, 2006 at 10:00 a.m.  The date Ms. Bonner or the purchaser received the signed sheriff's deed was irrelevant to the ownership issue.  Therefore, to the extent Ms. Bonner testified falsely by suggesting she was present when the sheriff signed the deed or possessed the signed deed prior to December 7, the testimony was harmless beyond a reasonable doubt.  Petitioner is therefore not entitled to federal habeas relief on his claim of a <u>Giglio</u> violation.

C.    <u>Ground Two:  "The trial court's failure to offer the Petitioner counsel at a pretrial hearing and voir dire jury selection requires a new trial."</u>

Petitioner contends the trial court violated his Sixth Amendment right to  counsel by failing to renew the offer of counsel at the pre-trial hearing on the State's motion in limine and at the commencement of jury selection (doc. 44 at 4, 6, 18–21; doc. 64 at 26–31).  He states he raised this claim on direct appeal of his conviction (doc. 44 at 6).

Respondent asserts that on direct appeal, Petitioner argued only the issue of the trial court's failure to renew the offer of counsel at the pre-trial hearing on the motion in limine; Petitioner did not argue that the trial court erred by failing to renew the offer at the commencement of jury selection (doc. 55 at 9, 12).  Therefore, the latter sub-claim was never presented to the state courts (*id.* at 12).  Respondent further argues Petitioner never presented the federal nature of the first sub-claim to the state courts; Petitioner raised solely as state law issue with regard to the trial court's failure to renew the offer of counsel at the pre-trial hearing on the motion in limine (*id.* at 9).  Therefore, both sub-claims are unexhausted and procedurally barred (*id.* at 9, 12).

The state court record shows that on direct appeal of his conviction, Petitioner's second claim of error asserted that the trial court's failure to offer Petitioner counsel at the pre-trial hearing on the State's motion in limine violated Rule 3.111(d)(5) of the Florida Rules of Criminal Procedure, as well as Petitioner's rights under the Florida Constitution (Ex. G at 32–34).  Petitioner did not cite in conjunction with the claim a federal source of law on which he relied or a case deciding such a claim on federal grounds, nor did he label the claim "federal" or otherwise indicate a federal law basis for his claim (*id.*).  Additionally, Petitioner did not mention the trial court's failure to offer counsel at the commencement of jury selection (*id.*).  Therefore, Petitioner did not exhaust any

aspect of Ground Two in the state courts.  Further, direct appeal was the procedurally proper vehicle for raising a claim of trial court error of this nature; therefore any attempt to return to state court to present his federal claim would be futile, because a second appeal is not available.  Accordingly, Ground Two is procedurally barred.

Moreover, Petitioner failed to show he is entitled to federal review under the "cause and prejudice" exception or any other recognized exception to the procedural bar.  With regard to the aspect of his claim that was never presented, that is, the trial court's failure to renew the offer of counsel at jury selection, Petitioner argued in his state habeas petition that he received ineffective assistance of appellate counsel based upon counsel's failure to raise this argument on direct appeal (Ex. N at 11–15).  The proper standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  *See* Smith v. Robbins, 528 U.S. 259, 285,120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted).  The two components of an ineffectiveness claim under Strickland are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other.  Strickland, 466 U.S. at 697.  The focus of inquiry under the performance prong of the Strickland standard is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691.  Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal.  Jones v. Barnes, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 3314, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").  To demonstrate prejudice, Petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, Petitioner would have prevailed on appeal.  *See* Robbins, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the Strickland standard with regard to claims of ineffective assistance of appellate counsel.  Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit."  United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting Alvord v. Wainwright, 725 F.2d 1282, 1291 (11th Cir. 1984)).  Additionally, where an issue is not preserved for appellate review, appellate

counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits.  Diaz v. Sec'y Dep't of Corrs., 402 F.3d 1136, 1142 (11th Cir. 2005); Atkins v. Singletary, 965 F.2d 952, 957 (11th Cir. 1992); Francois v. Wainwright, 741 F.2d 1275, 1285–86 (11th Cir. 1984).  Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal.  Nyhuis, 211 F.3d at 1344 (citing Miller v. Dugger, 858 F.2d 1536, 1538 (11th Cir. 1988)).

The trial transcript shows that although the trial court did not renew the offer of counsel to Petitioner at the commencement of jury selection, the judge did so at the beginning of trial and acknowledged he should have done so at jury selection the previous day (Ex. C at 119–26).  The following exchange occurred:

> THE COURT:  Mr. Frances, previously you have elected to proceed without an attorney and I conducted a Faretta hearing initially and I've done it several other times as the case has gone along [*see* Ex. A at 23–40, 132–36; Ex. B at 210–11].  Do you understand that you have a right at any stage of the process to begin having an attorney represent you?  Do you understand that?
>
> THE DEFENDANT:  I do, Your Honor.
>
> THE COURT:  Do you understand that if you cannot afford to hire an attorney and if you're found indigent, an attorney will be appointed to represent you, do you understand that?
>
> THE DEFENDANT:  Yes, sir, I do.
>
> THE COURT:  In the past I've explained to you the advantages of having an attorney and the disadvantages of representing yourself.  Do you understand those advantages and disadvantages?
>
> THE DEFENDANT:  For the most part, Your Honor, yes, sir.
>
> THE COURT:  All right.  Well, I've got a qualified answer so I guess I'm going to have to go through it in a little more detail.
>
> THE DEFENDANT:  Yes, sir.

(Ex. C at 119– 20).  The court then conducted a very extensive discussion of the advantages of representation by counsel and the disadvantages of self-representation, inquiring several times as

to whether Petitioner understood those advantages and disadvantages (*id.* at 120–25).  Petitioner responded that he understood (*id.*).  The court continued:

> THE COURT:  . . . Now understanding these, again these advantages and disadvantages, do you still wish to proceed without an attorney representing you?
>
> THE DEFENDANT:  At this point, Your Honor, I do.
>
> THE COURT:  Okay.  Now yesterday I should have asked you these similar questions prior to jury selection and I didn't.  We moved right on into jury selection without me asking you the questions and was it your desire to proceed to jury selection without having an attorney represent you yesterday?
>
> THE DEFENDANT:  Yes, it was, Your Honor.
>
> THE COURT:  And if I had asked you these same questions yesterday or similar questions about proceeding to jury selection without having an attorney represent you, would your answers have been the same?
>
> THE DEFENDANT:  Most likely, Your Honor.
>
> THE COURT:  And so are you satisfied with proceeding at this time despite the fact that you did not have an attorney representing you at jury selection and I did not go through this same questioning process with you prior to jury selection?
>
> THE DEFENDANT:  I'm satisfied today, Your Honor.

(Ex. C at 125–26).

Appellate counsel reasonably could have concluded that Petitioner waived the issue of the trial court's failure to offer counsel at jury selection for appellate purposes, or that any error was harmless.  Therefore, Petitioner failed to demonstrate deficient performance by counsel, or a reasonable probability that the outcome of the appeal would have been different if counsel had raised this issue.  Petitioner thus failed to establish cause for his procedural default of this sub-claim (the trial court's failure to offer counsel at jury selection).  As to the other sub-claim (the trial court's failure to offer counsel at the pre-trial hearing), Petitioner does not allege cause for his failure to present the federal nature of that claim on direct appeal.  Therefore, he has not satisfied the "cause and prejudice" exception as to either sub-claim presented in Ground Two.

Moreover, Petitioner is not entitled to review through the "fundamental miscarriage of justice" gateway, because he failed to show it is more likely than not that no reasonable juror would have convicted him in light of the "new evidence" upon which he relies (the Execution Action Taken Sheet and the receipt showing the purchaser's receipt of the signed sheriff's deed).  *See* Schlup, 513 U.S. at 327.  Accordingly, Petitioner is not entitled to federal habeas review of Ground Two.

   D.   Ground Five: "Ineffective assistance of counsel during sentencing stage concerning Petitioner's attorney Reed Ammon's failure to investigate new evidence that state witness Jeffery [sic] Panella had predisposed bias against the Petitioner."

   Petitioner was represented by attorney Reed Ammon at the sentencing hearing on January 25, 2008 (Ex. B at 280–330).  Petitioner contends counsel was ineffective for (1) failing to set a hearing to determine the amount of restitution, (2) failing to call Jeffrey Panella to challenge his estimate of the amount of damage to the units, which was used to determine restitution, and (3) failing to investigate evidence which demonstrated Mr. Panella's bias against him, namely, that on November 21, 2009, Panella burglarized Petitioner's home resulting in a civil judgment entered against him on June 22, 2010 in Escambia County Circuit Court Case No. 2009 CA 001624, and Panella was convicted of a similar offense against the Bayou Breeze Condominium office on November 27, 2007 in Case No. 2009 CF 000558 (doc. 44 at 11–12, 55). Petitioner states he raised this claim as Claims I–IV in his amended Rule 3.850 motion (*id.* at 12).

   Respondent contends Petitioner failed to show that the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law, or based upon an unreasonable determination of the facts  (doc. 55 at 22–23).  Therefore, he is not entitled to habeas relief on Ground Five.

   1.   Clearly Established Federal Law

   As previously discussed, the standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have

been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms."  Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did [ ] were acts that some lawyer might do."  Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did [ ], no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so."  Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence."  Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ."  Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'"  *Id.* (quoting Putman v. Head, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the Strickland standard, Petitioner's burden of demonstrating prejudice is high.  *See* Wellington v. Moore, 314 F.3d 1256, 1260 (11th Cir. 2002).  The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'"  *Id.* (quoting Strickland, 466 U.S. at 693).  However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not,

or prove by a preponderance of evidence," that counsel's errors affected the outcome.  Strickland, 466 U.S. at 693–94.  Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Id. at 694.  Indeed, it would be "contrary to" the law clearly established in Strickland for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence.  Williams v. Taylor, 529 U.S. at 405–06.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  Strickland, 466 U.S. at 698; Collier v. Turpin, 177 F.3d 1184, 1197 (11th Cir. 1999).

> 2.    Federal Review of State Court Decision

Petitioner raised this claim as Claims I, II, III, and IV in his amended Rule 3.850 motion (Ex. U at 107–15).  The state circuit court denied the claim on the following grounds:

> . . . to the extent the Defendant is challenging the amount of restitution awarded, as opposed to the imposition of restitution at all, the Defendant has not sufficiently alleged how he was prejudiced by his counsel not objecting to the amount of restitution.  Attachment 2 [sentencing transcript], at 10–12.  In other words, the Defendant has not sufficiently alleged what evidence counsel should have produced at sentencing, or what argument counsel should have advanced at sentencing, to demonstrate that the amount of restitution should have been less than the amount ultimately imposed.  Without articulating what evidence counsel should have presented, or what argument counsel should have advanced, or other *specific* action that counsel should have taken at the restitution hearing, the claim is insufficient. . . .
>
> The Defendant argues that counsel should have "called Defense witnesses to refute estimate of damages by State."  However, the Defendant does not list the names of these witnesses or the substance of what their purported testimony would have been.  Thus, this assertion is insufficient.  The Defendant has not pointed to any specific evidence counsel could have introduced to establish the award of restitution awarded in this case was too high.

The only *specific* action the Defendant articulates that counsel should have done at the proposed restitution hearing was to impeach the State's witness Panella. The proposed impeachment evidence would have no direct bearing on whether the witness' estimate of the damage sustained by the victim was actually inaccurate. Moreover, the prosecutor stated to the court that:

> Let me just put on the record . . . just to have all our bases covered.  We do have some documentation that there would be testimony of some other things that Mr. Panella didn't actually look at when making that estimate.  But I've spoken with the victim, and he thinks that's acceptable and doesn't want to quibble over a couple thousand dollars.

Attachment 2, at 11–12.

Thus, it would seem that the State was prepared to show the amount of the estimate was *too low*.  Finally, the Court would note that counsel indicated to this Court at sentencing that "Mr. Frances is very willing and able to pay off that restitution amount in the amount, again, of $21,360."  Attachment 2, at 27.  Far from contradicting his trial counsel, when the Defendant addressed the Court, he stated:

> *I also want Your Honor to know that I've made paying the Dayne Family Trust restitution my number one priority.*  In order for me to accomplish this priority, it will be necessary for me to remain gainfully employed.  I would be able and willing to make a monthly payment in the amount of $200, or *if I'm able to pay off the restitution in its entirety at a* [sic] *earlier date, I would do that, also. I pray that this offer will be an acceptable amount*, and the victims in this case will show mercy on me and *allow me to pay the restitution*.

Attachment 2, at 29–30 (emphasis added)

After making these statements the Court [sic], the Defendant cannot legitimately claim that he had an objection to the imposition, or amount, of restitution imposed in this case at the time of sentencing.

In summary, the Defendant has made no facially sufficient allegation that his counsel's performance at sentencing was ineffective.  Evidence of the extensive damage caused by the Defendant was introduced at trial.  Attachment 1 [trial transcript], at 289–294.  Therefore, some amount of restitution was clearly appropriate.  The Defendant has not specifically alleged how counsel could have successfully argued for a lesser amount of restitution.  Moreover, the Defendant's own statements to the Court show that he did not object to the amount or imposition

of restitution.  The restitution statute "contemplates an evidentiary hearing *when there is a dispute as to restitution*."  Strickland v. State, 746 So. 2d 1189, 1190 (Fla. 2d DCA 1999) (emphasis added).

(Ex. V at 279–81).

Initially, Petitioner failed to show counsel performed deficiently with regard to investigating evidence of Mr. Panella's alleged bias, namely, Mr. Panella's alleged "burglary" of Petitioner's home on November 21, 2009, which resulted in a civil judgment on June 22, 2010 in Case No. 2009 CA 001624, and his conviction of a "similar offense" against the Bayou Breeze Condominium office on November 27, 2007 in Case No. 2009 CF 000558.  Petitioner's sentencing hearing was January 25, 2008, almost two years prior to Mr. Panella's alleged "burglary" of Petitioner's home.  As to the alleged burglary of the condominium office, Petitioner failed to show that evidence of that burglary indicated Mr. Panella's bias against Petitioner.

Additionally, Petitioner failed to show defense counsel was unreasonable for failing to set a hearing to determine the amount of restitution.  The record demonstrates that one of the issues to be determined at the sentencing hearing was the issue of the amount of restitution; indeed, the transcript demonstrates the prosecutor was prepared to present evidence on that issue (Ex. B at 289–90).  The record also demonstrates that the State was prepared to present evidence the written estimate of the damage submitted by Panella Home Works did not account for all of the damage and was thus too low (*id.* at 290–91).  However, Petitioner's counsel stated, "we're" stipulating to the amount indicated in the estimate, $21,360.00 (*id.* at 290).  Indeed, it is apparent from the sentencing transcript that Petitioner and his counsel agreed to a strategy of not contesting the amount of restitution to support the argument that the benefit to the victims from Petitioner's not serving time in prison and working to pay them restitution greatly outweighed any benefit to Petitioner's serving a prison sentence (*id.* at 305–19).  Defense counsel argued, "He is very much—we at the very beginning have stipulated to the amount of restitution that was indicated by the estimates, and Mr. Frances is very willing and able to pay off that restitution amount in the amount, again, of $21,360." (*id.* at 305–06).  Defense counsel submitted documentation "substantiating Mr. Frances' idea that he can legally earn the kind of money that would allow him to make restitution in the amount of what he is suggesting would be $200 a month" (*id.* at 306–08).  Immediately after defense counsel's

argument, Petitioner personally addressed the sentencing court (*id.* at 308–19).  After thanking the court for being fair and kind, and especially for allowing him to remain free on bail to enable him to complete work projects for customers, he told the court:

> I also want Your Honor to know that I've made paying the Dayne Family Trust restitution my number one priority.  In order for me to accomplish this priority, it will be necessary for me to remain gainfully employed.  I would be able and willing to make a monthly payment in the amount of $200, or if I'm able to pay off the restitution in its entirety at a [sic] earlier date, I would do that also.  I pray that this offer is an acceptable amount, and the victim in this case will show mercy on me and allow me to pay the restitution.
>
> . . . .
>
> I hope my success [serving prior probationary sentences "without any incident or violation of probation"] demonstrates to Your Honor that if you were to sentence me to probation, allow me the opportunity to pay restitution [sic].  I will diligently abide by any terms of probation you impose.

(*id.* at 308–09, 313).  It is readily apparent that Petitioner and defense counsel agreed to a strategy of <u>not</u> disputing the amount of restitution to support their argument that a probationary sentence would be more beneficial to the victim than a sentence of incarceration.  This was a reasonable strategy.  The fact that it was not successful in hindsight does not render counsel's performance at the time of sentencing deficient or unreasonable.

Petitioner failed to establish that the state court's denial of this claim of ineffective assistance of counsel was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>.  Therefore, he is not entitled to habeas relief on Ground Five.

## V.   CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L.

Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

Petitioner's motion to expand the record (doc. 58) is **GRANTED**.

And it is respectfully **RECOMMENDED**:

1.      That the amended petition for writ of habeas corpus (doc. 44) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.


At Pensacola, Florida, this 6th day of February 2012.


/s/ Elizabeth M. Timothy
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**